IN THE COUNTY COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

JEFFERY A. GREEN,

    Plaintiff,

v.

PORTFOLIO RECOVERY
ASSOCIATES, LLC,

    Defendant.

_____/

CASE NO.:

GENERAL JURISDICTION DIVISION

JURY DEMAND

## COMPLAINT

Plaintiff hereby sues Defendant for violating the Florida Consumer Protection Practices Act, codified at Fla. Stat. § 559.55, *et seq.* (sometimes "FCCPA") and the Fair Debt Collection Practices Act codified at 15 U.S.C. § 1692 *et seq*, (sometimes "the FDCPA"), and states the following:

1. This Court has jurisdiction because Plaintiff is seeking damages between $5,000.00 and $10,000.00.

2. Venue is proper because the actions occurred in this county and specific jurisdiction exists under section 48.193(1)(a) of the Florida Statutes because Defendant's business conduct, the telephone communication attempting to collect a debt, reached into the state of Florida and is the basis of this lawsuit.

3. All conditions precedent to the bringing of this action have been performed, have occurred, or have been waived.

4. This is an action under the FDCPA and the FCCPA which are designed to protect consumers from abusive, deceptive, unfair, and undignified practices by debt collectors.

5. The pervasiveness of aggressive consumer collections nowadays has perhaps overshadowed the evolution of the plight of accused debtors and the substantial protections that both federal and state legislators have enacted in reaction to the long history of abusive collection practices.

## HISTORICAL BACKGROUND

### Debts Collection in Great Britain

6. In the Kingdom of Great Britain and the later United Kingdom, debtors' prisons varied in the amount of freedom they allowed the debtor. With a little money, a debtor could pay for some freedoms; some prisons allowed inmates to conduct business and to receive visitors; others (including the Fleet and King's Bench Prisons) even allowed inmates to live a short distance outside the prison — a practice known as the "Liberty of the Rules" — and the Fleet even tolerated clandestine "Fleet Marriages."

7. Life in these prisons, however, was far from pleasant, and the inmates were forced to pay for their keep. Samuel Byrom, son of the writer and poet John Byrom, was imprisoned for debt in the Fleet in 1725, and in 1729 he sent a petition to his old school friend, the Duke of Dorset, in which he raged against the injustices of the system:

> What barbarity can be greater than for gaolers (without provocation) to load prisoners with irons, and thrust them into dungeons, and manacle them, and deny their friends to visit them, and force them to pay excessive fines for their chamber rent, their victuals and drinks; to open their letters and seize the charity that is sent to them! And when debtors have succeeded in arranging with their creditors, hundreds are detained in prison for chamber-rent and other unjust demands put forward by their gaolers, so that at last, in their despair, many are driven to commit suicide... gaolers should be paid a fixed salary and forbidden, under pain of instant dismissal, to accept bribe, fee or reward of any kind... law of imprisonment for debts inflicts a greater loss on the country, in the way of wasted power and energies, than do monasteries and

nunneries in foreign lands, and among Roman-Catholic peoples... Holland, the most unpolite country in the world, uses debtors with mildness and malefactors with rigour; England, on the other hand, shows mercy to murderers and robbers, but of poor debtors impossibilities are demanded.

8. Some debtor prisoners were even less fortunate, being sent to prisons with a mixture of vicious criminals and petty criminals, and many more were confined to a single cell. The father of the English author Charles Dickens was sent to one of these prisons (the Marshalsea), which were often described in Dickens's novels.

9. The Debtors' Act of 1869 abolished imprisonment for debt, although debtors who had the means to pay their debt, but did not do so, could still be incarcerated for up to six weeks. Some of the most notable of London's debtors' prisons are the Coldbath Fields Prison, Fleet Prison, Giltspur Street Compter, King's Bench Prison, Marshalsea Prison, Poultry Compter, and Wood Street Counter.

### The Industry of Buying Bad Debt in the United States

10. Defendant is in the business of buying bad debt and then attempting to collect on it to turn a profit. The following provides an overview of Defendant's industry in general which, although regulated, offers many incentives for consumer abuse.

11. The debt buying industry in the United States began as a result of the savings and loan crisis of the 1980s. During this time banks were closing at an alarming rate and the Federal Deposit Insurance Corporation (FDIC), which insures deposits up to a certain amount, received the assets of the bank to cover the expenses associated with repaying the closed banks depositors.

12. The RTC held auctions around the country allowing various organizations to bid for portfolios of mixed assets. At these auctions the bidders were not able to evaluate the assets

prior to bidding and most purchasers had no idea what they had purchased until they had left the auction. The availability of these assets to the general public was the fuel used to launch the debt buying industry.

13. Due to the historic profitability of the business, the debt buying industry has seen dramatic expansion since 2000. Debt buyers purchased approximately $110 billion in face value of delinquent debts in 2005, which is about double the amount bought in 2000.[1] Credit card debt comprises seventy percent of the accounts sold to debt buyers, followed by automobile loans, telecommunications debt and retail accounts. However, purchased debts can also include personal loans, utility bills, medical bills, primary and secondary mortgages, etc.

14. Depending on the age and history of the debt, a buyer typically pays between 3 and 16 percent of the face value of the debt. Accounts that come directly from the original creditor without having been placed with a collection agency have the highest value, with prices decreasing based on the number of agencies that have previously attempted to collect the debt. As a result of the 2008 economic downturn, prices for the best accounts have fallen from the 2007-2008 high of 14 cents on the dollar to 4-7 cents. However, the large increase in delinquent accounts as a result of the recession has also resulted in sizable growth in the debt buying industry overall.

15. Debt buyers range in size from very small private businesses to multi-million dollar publicly traded companies - there are currently four publicly traded debt buyers. NCO, previously the largest debt collector, was taken private in 2006 after merging with One Equity Partners. As the visibility and profitability of the industry has grown, so too has competition, both in terms of the number of debt buyers and the rising prices of bad debt. Additionally, there

is a secondary market in this debt, with the debt buyers reselling the debt. Debt buyers may be classified as "active"—those who attempt to collect on the accounts they purchase (such as Defendant), or "passive"—those who invest in the debt and then outsource the collection activities to a separate collection agency or collection law firm.

16. Due to the varying size of debt buying organizations, not all organizations have the capital required to purchase large portfolios directly from the debt issuer. Historically, smaller debt buying firms would have to wait and purchase their debt accounts from a larger buyer after that larger buyer had already attempted to collect on the account.

17. Debt buying has historically taken place via the purchase and sale of whole portfolios consisting of a static group of accounts. Debt issuers usually prefer to sell their entire portfolio to a single debt buyer because the issuer is responsible for supplying the debt buyers with the documentation needed to prove the account in a court of law. This documentation known as "media" in the debt buying industry may include the original account application, monthly statements, affidavits of sale, and charge-off statements. This information is necessary to prove in court that the debtor owes the money and that the debt buyer owns the account.

18. Most of the major banks that sell all or a portion of their charged-off assets sell their accounts to a small selection of pre-approved buyers who purchase using a vehicle known as a "Forward Flow Agreement." A forward flow is an agreement between a debt buyer and debt seller to transact a fixed amount of debt over a fixed period of time for a predetermined price. For example a debt buyer and debt seller may enter an agreement to transact $20 million face value of debt each month for 12 months at a price of 7%.

19. A debt buyer does not have the same incentive to maintain the customer relationship with a debtor as the original creditor, and some debt buyers may be unconcerned about negative publicity and complaints. Thus, many debt buyers engage in abusive debt collection practices, which are illegal under the Fair Debt Collection Practices Act (discussed in the next section), including the following:

- Filing lawsuits with no documentation showing that the debt was ever purchased or assigned to the plaintiff.

- Pursuing debts that are not actually owed by the person being targeted.

- Attempting to collect, improperly suing, or threatening to sue people on debts that are past the applicable statute of limitations or were settled and closed via bankruptcy.

- Reporting inaccurate creditor information to a credit bureau.

- Impersonating law enforcement and threatening to have a person arrested, or threatening to directly garnish a person's wages, seize their property, etc.

- Failing to validate debt in writing when requested.

- Continuing to call a person's place of employment when instructed not to.

- Ignoring cease-and-desist notices to stop telephoning and communicate only via mail.

- Verbally abusing, using obscene language, threatening and harassing consumers.

20. The next section discusses the legislative response to the foregoing.

**Consumer Debt Protection in the United States**

21. In the United States, Debt collectors who work on commission are highly motivated to convince debtors to pay the debt. These practices are highly regulated by The Fair

Debt Collection Practices Act ("FDCPA"), State laws to protect consumers, and the Consumer Financial Protection Bureau (CFPB), the Federal Trade Commission, and State regulatory agencies. Several Federal and State higher courts decisions have outlined several bad practices.

22. In the US, the FDCPA prohibits calls to the debtor if the call will cost the debtor toll charges (in most other countries recipients of telephone calls are not charged, so this issue does not arise). The FDCPA also establishes what time of day calls can be made at, to whom and where. If a person answers, the call center may track statistics (e.g., the times and days when someone answers) in order to place calls at times when the debtor is more likely to be home; typically this is done by an automated dialing system between the times of 8am and 9pm local standard time. The collector may not use illegal and deceptive practices (for example, threatening the debtor with arrest or impersonating law enforcement). The collector cannot use obscene language and must inform the debtor of the nature of the call (collecting a debt) and their name and the name of the collection company when requested.

23. International debt collection is a less common and specialized field. Not many companies specialize in this sort of collection as there may be a need to speak different languages and have knowledge of the different legal systems and laws. International collection calls are often made in a different language than used in the collecting company.

24. Collection agencies are sometimes allowed to contact individuals other than the debtor, usually in an attempt to locate the debtor but without mentioning the debt. In the US under the FDCPA a collector is permitted to call a neighbor or relative for help in locating the person who owes a debt. Collectors may only ask for "address, home phone number, and place of work." Collectors are " ... not permitted to discuss [the] debt with anyone other than [the

debtor], [their] spouse, or [their] attorney." The debtor can give permission to the collection agency to speak to somebody else besides the above mentioned. Collectors must state their name and must give the name of their employer if the person specifically asks. They may only contact each person once, unless it is believed that the person gave the collector incorrect or incomplete information at the time, but now has complete or updated information. Collectors may contact a debtor at the workplace unless the collector has been informed the employer prohibits such calls, in which case the collector must cease all calls to the debtor's workplace immediately.

25. At times a person with no connection to the debt or the debtor may be contacted by a collector by error. Examples include victims of identity theft and people erroneously targeted due to a similar name. Alternatively, the alleged debtor may dispute that the debt is payable. In such cases the alleged debtor can require that the collector or creditor prove that the debt is payable—in no jurisdiction does a debt exist merely because a collector says so. In the United States under the FDCPA, anyone has the right for any reason to request written validation of the debt or to demand the collector cease communication.

## THE CASE AT HAND

26. Plaintiff is a "consumer" as defined by the FDCPA, 15 U.S.C. §1692a(3).

27. Plaintiff is a natural person allegedly obligated to pay a "debt," as defined by 15 U.S.C. §1692a(5), to Defendant.

28. Defendant is a "debt collector" as that term is defined by 15 U.S.C. §1692a(6), because the Defendant regularly collects defaulted debts originated by others.

29. Plaintiff's alleged debt was incurred "primarily for personal, family, or household purposes" within the meaning of 15 U.S.C. § 1692a(5).

30. In 2012, Defendant sued Plaintiff for the collection of the same alleged debt it now seeks recovery of in this action (*Portfolio Recovery Associates, LLC v. Green*, Case No. 12-01978-SP-05, Miami-Dade County ("the Prior Action")).

31. The Prior Action was resolved on an out-of-court basis and the case was voluntarily dismissed *with prejudice*.

32. Because the Prior Action involved the same alleged debt, Defendant was on notice that Plaintiff was represented by the undersigned attorney, and easily knew how to contact him.

33. Nevertheless, on May 13, 2013, nearly one year after the resolution of the Prior Action, Defendant sent at least one written communication attempting to collect on the same alleged debt directly to Plaintiff knowing that the debt was settled and knowing that it should not be initiating any direct communications with anyone but the undersigned.

34. Plaintiff has incurred costs and attorney's fees as a result of Defendant's unlawful conduct.

## COUNT I
## FCCPA

35. Paragraphs 1 through 13 incorporated by reference.

36. In pertinent part, Fla. Stat. § 559.72 provides

> 559.72 Prohibited practices generally.—In collecting consumer debts, no person shall:
>
> [...]
>
> (18) Communicate with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the debtor's attorney fails to respond within 30

days to a communication from the person, unless the debtor's attorney consents to a direct communication with the debtor, or unless the debtor initiates the communication.

37. Defendant violated Fla. Stat. § 559.72(18) when it made direct collection efforts with Plaintiff, knowing he was represented by an attorney with regard to the same alleged debt.

38. Pursuant to Fla. Stat. § 559.77, Plaintiff may bring a lawsuit against Defendant seeking actual and statutory damages and costs and attorney's fees for any violation of the FCCPA.

39. Plaintiff has been damaged as a proximate result of Defendant's violation of Fla. Stat. § 559.72(18).

**WHEREFORE**, Plaintiff demands judgment against Defendant for pursuant to § 559.77 for actual and statutory damages, costs and attorney's fees, and any and all such further relief the Court deems just and equitable.

## COUNT II
### FCCPA

40. Paragraphs 1 through 13 incorporated by reference.

41. Because Defendant knew of the settlement in the Prior Action, it also knew that seeking payment of the debt on May 13, 2013 constitutes a violation of § 559.72(9) which prohibits anyone from attempting to collect on an illegitimate debt.

42. Pursuant to Fla. Stat. § 559.77, Plaintiff may bring a lawsuit against Defendant seeking actual and statutory damages and costs and attorney's fees for any violation of the FCCPA.

43. Plaintiff has been damaged as a proximate result of Defendant's violation of Fla. Stat. § 559.72(18).

**WHEREFORE**, Plaintiff demands judgment against Defendant for pursuant to § 559.77 for actual and statutory damages, costs and attorney's fees, and any and all such further relief the Court deems just and equitable.

## COUNT III
## FDCPA

44. Paragraphs 1 through 13 incorporated by reference.

45. By demanding payment of a debt that Plaintiff has already satisfied, Defendant violated § 1692e(2) which prohibits collectors from making false representations about the legal status of a debt.

46. Defendant is subject to civil liability under 15 U.S.C. §1692k which provides for actual and statutory damages, and costs attorney's fees for any violation of the FDCPA.

47. Defendant's violation of the FDCPA was the proximate cause of Plaintiff's damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant for pursuant to § 1692k for actual and statutory damages, costs and attorney's fees, and any and all such further relief the Court deems just and equitable.

Plaintiff demands a jury trial on all issues so triable.

_____
Erik Kardatzke, Esq. FBN 17862
Debt Defense, P.L. – A Law Firm
6915 Red Road, Suite 200
Coral Gables, Florida 33143
Tel.: (305) 444-4323
service@debtdefenselaw.com